Karin M. Sweigart (SBN: 247462)
Jesse D. Franklin-Murdock (SBN: 339034)
**SWEIGART MURDOCK, LLP**
1160 Battery Street, Suite 100
San Francisco, California 94111
Telephone: (415) 873-0123
Facsimile: (873) 890-0791
Email: Karin.Sweigart@sm-llp.com;
Jesse@sm-llp.com

Attorneys for Plaintiffs M.F. (by and through his Guardian ad Litem R.S.), R.S., and A.F

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

M.F. (a minor, by and through his Guardian ad Litem, R.S.), R.S., and A.F.

Plaintiffs,

v.

SAN DIEGUITO UNION HIGH SCHOOL DISTRICT; ROB COPPO, an individual; ANGELA GUERRERO, an individual; THERESA BARNES, an individual; and DOES 1 through 10, inclusive,

Defendants.

**Case Number:** '26CV4737 WQHGC

**COMPLAINT FOR:**
**(1) Violation of the First Amendment — Viewpoint Discrimination (42 U.S.C. § 1983);**
**(2) Violation of the First Amendment — Retaliation (42 U.S.C. § 1983);**
**(3) Violation of the First Amendment — Compelled Speech (42 U.S.C. § 1983);**
**(4) Violation of the Fourteenth Amendment — Equal Protection (42 U.S.C. § 1983);**
**(5) Violation of California Education Code § 48907;**
**(6) Intentional Infliction of Emotional Distress;**
**(7) Negligence;**
**(8) Violation of the Tom Bane Civil Rights Act;**

**(JURY TRIAL DEMANDED)**

Plaintiffs M.F.(a minor, by and through his mother and Guardian ad Litem, R.S.), R.S., and A.F. bring this civil rights action against Defendants San Dieguito Union High School District (the "District"), Rob Coppo, Angela Guerrero, Theresa Barnes, and Does 1 through 10, arising from the District's punishment of M.F. for engaging in constitutionally protected political speech at a public high school and M.F.'s subsequent involuntary commitment to a psychiatric facility without any lawful basis to believe he posed a danger to himself or others:

## I. INTRODUCTION

1. M.F., a high-achieving student and athlete with no disciplinary history of consequence, attended an on-campus anti-ICE protest on February 6, 2026, carrying a small satirical flyer that expressed support for President Trump, the Second Amendment, and personal liberty. Because M.F.'s viewpoint diverged from that of the protest's organizers and from at least one of his teachers, Defendants responded with a series of escalating punitive measures directly aimed at punishing M.F. for his protected speech. They first imposed consecutive days of detention. They then leveled unfounded accusations that M.F. had searched the internet for information about killing people and disposing of bodies—searches he did not conduct, performed on a laptop that the District knew other students could and did access and alter. Defendants next subjected M.F. to police interrogation without his parents or an attorney present. Ultimately, they caused M.F. to be placed on an involuntary psychiatric hold under California Welfare and Institutions Code § 5150, despite the complete absence of any evidence that he posed a danger to himself or anyone else. Two independent evaluating psychiatrists later confirmed what should have been apparent from the outset: M.F. had done nothing to warrant involuntary confinement.

2. Unfortunately, M.F.'s ordeal was not an isolated overreaction by a few individuals. In late February 2026, the District suspended another Torrey Pines High School student for posting flyers expressing support for U.S. Immigration and Customs Enforcement, while simultaneously taking no action against the students who staged the anti-ICE walkout that prompted both M.F.'s and that student's speech in the first place—even though the walkout signs the District tolerated included vulgar and threatening language. The District only reversed that second student's suspension, and expunged it from his record, after a civil liberties organization intervened. Taken together, these events reflect a

custom and practice at the District of disciplining students who express politically conservative or pro-law-enforcement viewpoints while tolerating or excusing comparable or more provocative speech from students expressing the opposite viewpoint.

3. Plaintiff M.F. brings this action for compensatory and punitive damages, declaratory relief, and injunctive relief under 42 U.S.C. § 1983 for violations of his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and under California Education Code § 48907. All Plaintiffs bring this action for compensatory and punitive damages under California tort law.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over M.F.'s federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

5. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same case or controversy as M.F.'s federal claims and form part of the same case.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant San Dieguito Union High School District is located within, and a substantial part of the events giving rise to the claims alleged herein occurred within, the Southern District of California.

## III. PARTIES

7. Plaintiff M.F. is, and at all relevant times was, a minor residing in San Diego County, California, and a student at Torrey Pines High School ("TPHS"), a public high school within Defendant San Dieguito Union High School District. He brings this action by and through his mother, Guardian ad Litem R.S., pursuant to Federal Rule of Civil Procedure 17(c). A motion for appointment of Guardian ad Litem is being filed concurrently herewith.

8. Plaintiff R.S. is, and at all relevant times was, an adult residing in San Diego County, California, and the mother of Plaintiff M.F. She brings this action in her individual capacity for compensatory and punitive damages under California tort law arising from Defendants' conduct toward her son, which she witnessed and which caused her severe emotional distress.

9. Plaintiff A.F. is, and at all relevant times was, an adult residing in San Diego County, California, and the father of Plaintiff M.F. He brings this action in his individual capacity for compensatory and punitive damages under California tort law arising from Defendants' conduct toward his son, which he witnessed and which caused him severe emotional distress.

10. Defendant San Dieguito Union High School District (the "District") is, and at all relevant times was, a public school district organized and existing under the laws of the State of California. The District operates TPHS and is responsible for the training, supervision, and discipline of the individual Defendants named herein.

11. Defendant Rob Coppo was, at all relevant times material to this Complaint, the Principal of TPHS and an employee of the District. He is sued in his individual capacity. At all relevant times, Coppo acted, and purported to act, under color of state law.

12. Defendant Angela Guerrero was, at all relevant times, an Assistant Principal of TPHS and an employee of the District. She is sued in her individual capacity. At all relevant times, Guerrero acted, and purported to act, under color of state law.

13. Defendant Theresa Barnes was, at all relevant times, a marketing teacher at TPHS and an employee of the District. She is sued in her individual capacity. At all relevant times, Barnes acted, and purported to act, under color of state law.

14. The true names and capacities of Defendants Does 1 through 10, inclusive, are presently unknown to Plaintiffs, who therefore sue these Defendants by fictitious names pursuant to Federal Rule of Civil Procedure 10. Plaintiffs are informed and believe, and on that basis allege, that each fictitiously named Defendant is in some manner responsible for the injuries alleged herein. Plaintiffs will amend this Complaint to allege the true names and capacities of the Doe Defendants when ascertained.

15. Plaintiffs are informed and believe, and on that basis allege, that each Defendant was, at all relevant times, the agent, servant, and/or employee of each of the other Defendants and, in doing the things alleged herein, was acting within the course and scope of that agency, service, and/or employment, and with the knowledge, consent, and/or subsequent ratification of each of the other Defendants.

//

## IV. FACTUAL BACKGROUND

16. At the time of the events described herein, M.F. was a 16-year-old high school sophomore at Torrey Pines High School. Prior to the events described in this Complaint, M.F. was a strong academic performer and a dedicated student athlete whose disciplinary record consisted of only minor, unremarkable incidents.

### A. The February 6, 2026, Protest and M.F.'s Protected Speech

17. On February 6, 2026, students at TPHS staged an on-campus walkout and protest against the Trump administration's immigration enforcement policies. Publicly available Instagram posts and news accounts of the TCPS walkout show students carrying signs stating, "ICE is the KKK spelled differently," "THE REAL CRIMINAL IS YOUR PRESIDENT," and "ICE is the new GESTAPO," among other political messages.









18. M.F. and his friend, A.P., hold political views which differ from many of their classmates. On the day of the protest, M.F. and A.P. attended to express a contrary viewpoint, intending to show their support for the First Amendment, the Second Amendment, and President Trump. M.F. carried the flyer to show his support for the First and Second Amendments and President Trump. Online, they found an image similar to the satirical message shown below and printed it on 8.5″ x 11"

paper. Hereinafter, "the Flyer."




19. Within five minutes of arriving at the protest, a student protesting ICE physically attacked and injured A.P., who is smaller than many other students. On information and belief, Principal Rob Coppo intervened, but did not detain or punish the student who assaulted A.P.

**B. The District's Escalating Response to M.F.'s Speech**

20. M.F. returned to his marketing class, taught by Defendant Theresa Barnes, still holding the Flyer. Upon seeing the Flyer, Defendant Barnes became visibly upset, sobbing and unable to regain her composure. Presumably due to her inability to control her emotions, she left the classroom. The classroom remained unattended for approximately fifteen to twenty minutes before Defendant Barnes returned.

21. On February 9, 2026, R.S. received a phone call from assistant principal and Defendant Angela Guerrero. Defendant Guerrero told R.S. that M.F. was being punished for the Flyer because some students found it "offensive" and "frightening." Defendant Guerrero forced M.F. to serve two days of detention because of the viewpoint expressed on the Flyer. Similarly, and despite being assaulted, A.P. was also punished for holding an "insensitive" flyer in counter protest.

22. On February 11, 2026, M.F. was called to the office because school personnel claimed

"disturbing searches" had been conducted on a school computer M.F. had been using in Defendant Barnes's class. School personnel claimed the content of the alleged searches included: "How to load a Glock," "How to load a magazine," "How to dispose of a body," and "How to get away with the perfect murder." School personnel did not inform M.F. or his parents of how they became aware of these searches.

23. M.F. immediately denied having conducted these searches. School personnel acknowledged that students tampering with other students' computers is a regular occurrence because the class where the searches allegedly occurred is a project-based environment where students move freely around the room and generally leave their laptops open. Teachers also can remotely control student computers.

24. Defendant Gurrero told M.F. that she believed M.F. was not responsible for the searches. Defendant Guerro did not indicate that she found M.F. to be a danger to himself or others. Instead, she sent M.F. back to class without any further disciplinary action or any indication M.F. was in any trouble. M.F. ended his day without incident and came back to school the following day. On information and belief, the school conducted no further investigation into who was responsible for the searches.

**C. Police Interrogation and M.F.'s Involuntary Psychiatric Commitment**

25. For M.F., February 12, 2026, started as any other normal school day. He attended morning classes without incident. That changed in the afternoon when school personnel removed M.F. from class and called the police to interrogate M.F.

26. After the police interrogation had already begun behind closed doors, school officials called R.S. to inform her they had called police to question her son. When M.F.'s parents arrived, approximately five to six police officers were present at the school questioning M.F. behind closed doors without a parent or attorney present.

27. School officials refused to allow M.F.'s parents to see him, instead requiring them to speak with a crisis social worker. The crisis social worker stated that Defendant Barnes requested the police because the searches made Defendant Barnes feel "scared" and "unsafe." The crisis social worker also stated that Defendant Barnes had cried after seeing the Flyer because the Flyer made her

feel "unsafe." Defendant Barnes' complaints were the sole justifications the crisis social worker provided for calling the police.

28. Despite M.F.'s denial, the absence of definitive evidence or even an investigation showing that M.F. was responsible for the searches, and the lack of any other alleged conduct warranting police or mental health intervention, school officials relayed false information which caused M.F. to be placed on a 5150 psychiatric hold. California law authorizes a 5150 hold only when a person has a mental health disorder that renders him a danger to himself, a danger to others, or gravely disabled.

29. The involuntary patient advisement stated that M.F. was being forcibly placed into the psychiatric facility because, "as a result of a mental health disorder," M.F. was "likely" to "harm someone else." The specific facts listed supporting that decision were: "you have been researching how to load a glock, confessing to murder, homicide videos and targeting LGBT community."


My name is Erika Wilson LCSW My position here is Clinician
You are being placed into this psychiatric facility because it is our professional opinion, that as a result of a mental health disorder, you are likely to: (check applicable)

☐ Harm yourself ☑ Harm someone else ☐ Be unable to take care of your own food clothing or shelter

(List specific facts upon which the allegation of dangerous or gravely disabled due to mental health disorder is based, including pertinent facts arising from the admission interview):

We believe this is true because:
you have been researching how to load a glock, confessing to murder, & homicide videos and targeting LGBT community

You will be held for a period of up to 72 hours. This (☑ does) / (☐ does not) include weekends or holidays. Your 72-hour period begins at: 14:49pm (Time) on: 2/12/26 (Date)

30. M.F. did not research how to load a "glock," did not confess to murder, was not watching homicide videos, and did not target the LGBT community. The claims were completely false, as school officials were fully aware.

31. M.F. was put in a police car and transported to a psychiatric hospital where he was committed and forced to stay against his will and the will of his parents.

32. Police requested, and were granted, permission to search M.F.'s home. Officers conducted a search of the residence and found nothing suspicious or concerning.

33. M.F. was forced to stay at the psychiatric facility overnight. His parents were not permitted to stay with him.

34. M.F. was evaluated by two independent psychiatrists who concluded that M.F. did not

appear to have conducted the searches and showed no signs of mental illness or violent behavior. One of the doctors who evaluated M.F. stated that he could not believe the school's actions, to the point that he expressed concern that M.F. may have been targeted for his political beliefs because he saw no reason that M.F. should have been placed on a 5150 hold.

**D. The Re-Entry Meeting and Continuing Retaliation**

35. On February 18, 2026, M.F. and his parents met with school officials. At that meeting, Defendant Coppo held up the 8.5" x 11" Flyer that included a picture of a gun that was roughly three inches tall and one inch wide and accused M.F. of "holding a semi-automatic gun in students' faces and scaring them." At the same meeting, Defendant Coppo also accused M.F. of being an "LGBTQ bully." The basis for this allegation, Defendant Coppo claimed, was a group chat where another student (not M.F.) asked two transgender classmates whether they were boys or girls. Despite only having witnessed the exchange in the group chat and not actively participating, Defendant Coppo required M.F. to write a letter stating he wanted to know the students and be friends with them. M.F.'s parents were never notified of the incident or the required letter until that day.

36. On March 6, 2026, M.F. was called out of class by a school mental health specialist. M.F.—**a** high-achieving student with a near-perfect academic record—was asked to undergo testing for Special Education placement and ongoing mental health monitoring for two months. M.F. said no, to which the school told M.F. that he would be undergoing the testing unless his parents excused his attendance—which they did.

37. M.F. has continued to be targeted by school administrators. During a school lockdown as students were sheltering in place, Defendant Guerrero came to M.F.'s classroom, giving the impression that she was there specifically to check on M.F.'s whereabouts. Despite a varsity coach at another high school telling M.F. that he would have been a starting varsity pitcher on his team, M.F. was not even given a spot on the junior varsity baseball team at TPHS. This is on top of a marked change in the way other teachers and school personnel interacted with him from before to after he held the Flyer.

38. As a direct and proximate result of Defendants' conduct—particularly the decision to cause a healthy, high-achieving, and well-adjusted high school sophomore to be placed on an

involuntary 5150 psychiatric hold for protected political speech and for conduct he did not commit—M.F. and his parents have suffered, and continue to suffer, severe and ongoing emotional distress, humiliation, anxiety, loss of educational and athletic opportunities, reputational harm, and other damages.

39. Before these events, M.F. was a strong academic performer and dedicated student-athlete with no meaningful disciplinary history. He enjoyed school, trusted school officials, and freely participated in campus life. Defendants' actions stripped him of that security. After being pulled from class, interrogated by multiple police officers behind closed doors without a parent or attorney present, and falsely portrayed to a psychiatric facility as a danger, M.F. was forcibly transported in a police car and confined overnight in a psychiatric hospital against his will and the will of his parents. Two independent psychiatrists later confirmed what should have been obvious from the outset: M.F. showed no signs of mental illness or violent propensity and had done nothing to justify involuntary commitment.

40. The trauma of that experience has been profound. M.F., who previously felt safe and engaged at school, now experiences significant anxiety and dread when on campus. He reasonably believes he continues to be singled out because of the viewpoint expressed on the Flyer. The stigma of a 5150 hold—even one later determined to be wholly baseless—has damaged his sense of self, chilled his willingness to engage in open political expression, and altered the way peers, teachers, and administrators interact with him. He has been excluded from athletic opportunities he otherwise would have secured, subjected to continued administrative scrutiny (including an attempted special education evaluation he did not need and a targeted classroom check during a lockdown), and forced to navigate a school environment in which the adults charged with his care treated him as a potential threat for holding a satirical political flyer.

41. M.F.'s parents have suffered parallel and independent harm. They endured the terror of learning that school officials had caused their healthy son to be committed to a psychiatric facility without any lawful basis, the helplessness of being denied access to him during the crisis, and the anxiety and ongoing distress of watching a previously confident, well-adjusted adolescent withdraw from activities and spaces he once enjoyed. The family's trust in the school and in the fairness of school

authority has been fundamentally undermined.

42. These harms are the natural and foreseeable consequence of Defendants' decision to escalate political disagreement into police interrogation and involuntary psychiatric confinement of a minor who posed no danger to himself or anyone else.

**E. The District's Custom and Practice of Viewpoint-Based Discipline**

37. Worse, M.F.'s punishment was not an isolated episode of poor judgment by individual TPHS staff. In the weeks following the February 6, 2026, walkout, the District suspended another TPHS student for one day after he posted flyers reading "We heart ICE," signed "Real Americans," in school hallways—flyers expressing a pro-law-enforcement viewpoint opposed to that of the walkout organizers.

38. The District justified that suspension on the ground that the flyers constituted "harassment, threats, or intimidation," even though the anti-ICE walkout signs the District had tolerated weeks earlier included much more incendiary language (as shown above). On information and belief, the District took no disciplinary action against any student who carried anti-ICE or anti-Trump signs.

39. After the Foundation for Individual Rights and Expression intervened on the suspended student's behalf, the District—on or about March 23, 2026—notified the student's attorney that it would expunge the suspension from his record, while publicly claiming that the District "does not discipline students because of their political viewpoints."

40. On information and belief, the District's disparate treatment of M.F. and of the "We heart ICE" student reflects a custom, practice, and/or policy at the District of disciplining students who express politically conservative or pro-law-enforcement viewpoints more severely than students who express the contrary viewpoint, for materially similar or less serious conduct.

**F. Ratification by Officials with Final Policymaking Authority**

41. On information and belief, the discipline imposed on M.F. for his protected speech, and the decision to seek his involuntary commitment, were known to, and approved by, officials with final policymaking authority for the District, including the Superintendent and/or the District's Board of Trustees, who took no corrective action with respect to M.F. despite the District's own subsequent recognition, in the "We heart ICE" matter, that discipline may not be imposed based on a student's

political viewpoint.

## V. EXHAUSTION OF REMEDIES

43. On May 13, 2026, prior to filing suit, M.F. satisfied the administrative prerequisite to filing suit by serving a Government Claims Act notice on the District for all claims for which administrative exhaustion was required. The District rejected the claim on June 11, 2026, so this action is timely filed.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the First Amendment – Viewpoint Discrimination

### (42 U.S.C. § 1983 — Plaintiff M.F. Against Defendants Coppo, Guerrero, and Barnes)

44. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

45. The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits government actors from discriminating against speech based on viewpoint.

46. M.F.'s flyer was political speech protected by the First Amendment. It was not lewd, vulgar, or indecent; did not promote unlawful drug use; did not bear the school's imprimatur; and did not materially and substantially disrupt classwork or invade the rights of others.

47. Defendants Coppo, Guerrero, and Barnes disciplined, investigated, interrogated, and ultimately caused the involuntary commitment of M.F. because of the viewpoint the Flyer expressed—support for liberty, the First Amendment, the Second Amendment, and President Trump—and not because of any legitimate, viewpoint-neutral concern. Students who expressed opposing viewpoints at the same protest, including the student who physically attacked A.P., and other students holding similarly offensive signs of the opposite political viewpoint, were not subjected to discipline or targeted for retaliation.

48. As a direct and proximate result of the Defendants' conduct, Plaintiff has suffered and continues to suffer general and special damages in an amount according to proof, including emotional distress, humiliation, and deprivation of his constitutional rights. Plaintiff is further entitled to an award of punitive damages against the individual Defendants in an amount sufficient to punish and deter the

wrongful conduct alleged herein, according to proof.

**SECOND CAUSE OF ACTION**

**Violation of the First Amendment – Retaliation**

**(42 U.S.C. § 1983 — Plaintiff M.F. Against Defendants Coppo, Guerrero, and Barnes)**

49. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

50. To prevail on a First Amendment retaliation claim, a plaintiff must show that (1) he engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct.

51. Here, M.F. engaged in constitutionally protected activity by bringing the Flyer to the February 6, 2026, protest and by continuing to assert, truthfully, that his Flyer was protected political expression. Defendants' actions—including detention, unfounded accusations of conducting internet searches, police interrogation without a parent or attorney present, and M.F.'s involuntary psychiatric commitment—would chill a person of ordinary firmness from engaging in protected political expression, and did in fact chill M.F., who no longer feels free to express his political views at school.

52. M.F.'s protected speech was a substantial motivating factor in Defendants' conduct: the escalating discipline began the moment M.F. displayed the Flyer at the protest and in Defendant Barnes's classroom and continued in direct response to M.F.'s continued assertion that his speech was constitutionally protected.

53. As a direct and proximate result of the Defendants' conduct, Plaintiff has suffered and continues to suffer general and special damages in an amount according to proof, including emotional distress, humiliation, and deprivation of his constitutional rights. Plaintiff is further entitled to an award of punitive damages against the individual Defendants in an amount sufficient to punish and deter the wrongful conduct alleged herein, according to proof.

**THIRD CAUSE OF ACTION**

**Violation of the First Amendment – Compelled Speech**

**(42 U.S.C. § 1983 — Plaintiff M.F. Against Defendant Guerrero)**

54. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

55. The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits government actors from compelling a person to express a message with which he disagrees. The government may not force a student to affirm a particular belief, express a personal sentiment, or adopt a viewpoint as the price of remaining free from punishment or official pressure.

56. Defendant Guerrero required M.F. to write a letter stating that he wanted to know two transgender students and to be friends with them. M.F. had not participated in the underlying groupchat exchange; he had merely witnessed another student's questions. Defendants never notified M.F.'s parents of any alleged misconduct or of the letter requirement until the February 18, 2026, meeting.

57. By ordering M.F. to draft and deliver a statement of personal affinity and friendship, Defendant Guerro compelled M.F. to express a message prescribed by the school. The compelled statement was unrelated to any legitimate pedagogical purpose, was not necessary to maintain order or protect the rights of others, and was imposed as a punitive response to M.F.'s protected political speech and to his mere presence in a group chat.

58. A reasonable student in M.F.'s position would understand that refusal to write the letter risked further discipline, continued administrative scrutiny, or other adverse consequences. The requirement therefore coerced M.F. into expressing a message against his will.

59. As a direct and proximate result, Plaintiff has suffered and continues to suffer general and special damages in an amount according to proof, including emotional distress, humiliation, and deprivation of his constitutional rights. Plaintiff is further entitled to an award of punitive damages in an amount sufficient to punish and deter the wrongful conduct alleged herein, according to proof.

## **FOURTH CAUSE OF ACTION**

### **Violation of the Fourteenth Amendment – Equal Protection**

### **(42 U.S.C. § 1983 — Plaintiff M.F. Against Defendants Coppo and Guerrero)**

60. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

61. The Equal Protection Clause is violated when a plaintiff is intentionally treated

differently from others who are similarly situated and there is no rational basis for the difference in treatment.

62. M.F., who expressed a pro-liberty, pro-Second Amendment, and pro-President Trump viewpoint, was treated far more severely than similarly situated students at the same protest who expressed the opposing, anti-ICE viewpoint—including the student who physically attacked A.P. who was not disciplined at all. This disparate treatment recurred weeks later when the District suspended a student for pro-ICE speech while never disciplining the anti-ICE walkout participants whose signs included comparably or more provocative language.

63. There was no rational basis for this differential treatment; it was based solely on the viewpoint M.F. expressed.

64. As a direct and proximate result of Defendants Coppo and Guerrero's equal protection violations, M.F. suffered general and special damages in an amount according to proof, including emotional distress, humiliation, and deprivation of his constitutional rights. Plaintiff is further entitled to an award of punitive damages against Defendants Coppo and Guerrero in an amount sufficient to punish and deter the wrongful conduct alleged herein, according to proof.

**FIFTH CAUSE OF ACTION**

**Violation of California Education Code § 48907**

**(Plaintiff M.F. Against all Defendants)**

65. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

66. California Education Code § 48907 guarantees public school students the right to exercise free expression, including the right to express political opinions, subject only to narrow, content-neutral limitations not applicable here.

67. Defendants violated M.F.'s rights under Education Code § 48907 by disciplining him because of the content and viewpoint of the Flyer.

68. As a direct and proximate result, M.F. suffered general and special damages in an amount according to proof, including emotional distress and humiliation. M.F. is further entitled to an award of punitive damages against the individual Defendants in an amount sufficient to punish and

deter the wrongful conduct alleged herein, according to proof

**<u>SIXTH CAUSE OF ACTION</u>**

**Intentional Infliction of Emotional Distress**

**(Plaintiffs M.F., R.S., and A.F. Against All Defendants)**

69. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

70. Defendants' conduct—punishing a student for protected political speech, falsely characterizing his satirical flyer as a threat, refusing to allow his parents access to their son while being interrogated by police, and causing his overnight involuntary commitment to a psychiatric facility despite the absence of any evidence of dangerousness—was extreme and outrageous, and was undertaken with reckless disregard for the substantial certainty that it would cause M.F., R.S., and A.F. severe emotional distress. A previously confident, high-achieving sophomore with no history of mental-health issues or violent behavior was pulled from class, interrogated by multiple police officers behind closed doors without a parent or attorney present, falsely portrayed to mental-health evaluators as a danger to others based on fabricated computer searches and political speech, and forcibly transported in a police car to a psychiatric facility where he was confined overnight against his will and the will of his parents. Two independent psychiatrists later confirmed he showed no signs of mental illness or dangerousness. The experience left him and his parents with profound anxiety and dread whenever he is on campus, a lasting sense of stigma from the baseless 5150 hold, chilled willingness to express political views, damaged relationships with peers and school personnel, loss of athletic opportunities, and a fundamental loss of trust in the adults charged with M.F.'s care and safety.

71. As a direct and proximate result of Defendants' extreme and outrageous conduct, M.F., R.S., and A.F. suffered general and special damages in an amount according to proof, including emotional distress and humiliation. Plaintiffs are further entitled to an award of punitive damages against the individual Defendants in an amount sufficient to punish and deter the wrongful conduct alleged herein, according to proof

72. Defendant District is vicariously liable for the acts of its employees pursuant to California Government Code § 815.2.

**<u>SEVENTH CAUSE OF ACTION</u>**

**Negligence**

**(Plaintiff M.F. Against All Defendants)**

73. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

74. Schools stand in loco parentis to their students and owe them a duty to take all reasonable steps to protect them from foreseeable harm, including harm arising from the school's own disciplinary process.

75. Defendants breached that duty by, among other things: failing reasonably to investigate the computer searches falsely attributed to M.F. despite knowledge that other students had tampered with classmates' laptops; making false statements suggesting that M.F. posed a danger leading to a unnecessary and highly distressing involuntary psychiatric hold; and subjecting M.F. to escalating discipline based on a demonstrably false characterization of the Flyer.

76. As a direct and proximate result, M.F. suffered general and special damages in an amount according to proof, including emotional distress and humiliation. M.F. is further entitled to an award of punitive damages against the individual Defendants in an amount sufficient to punish and deter the wrongful conduct alleged herein, according to proof

77. Defendant District is vicariously liable for the acts of its employees pursuant to California Government Code § 815.2.

**EIGHTH CAUSE OF ACTION**

**Violation of the Tom Bane Civil Rights Act**

**(Cal. Civ. Code § 52.1 – Plaintiff M.F. Against All Defendants)**

78. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

79. California Civil Code § 52.1 (the Tom Bane Civil Rights Act) provides a private right of action against any person or entity who, by threats, intimidation, or coercion, interferes with or attempts to interfere with the exercise or enjoyment by any individual of rights secured by the Constitution or laws of the United States or of the State of California.

80. M.F. has the right to free speech and expression secured by the First Amendment to the United States Constitution and by Article I, § 2 of the California Constitution; equal protection of the laws secured by the Fourteenth Amendment to the United States Constitution and by Article I, § 7 of the California Constitution; and the right to free expression secured by California Education Code § 48907.

81. Defendants interfered with and attempted to interfere with M.F.'s exercise and enjoyment of the foregoing rights by threats, intimidation, and coercion. Among other things, Defendants:

a. imposed consecutive days of detention on M.F. solely because of the viewpoint expressed on the Flyer;

b. leveled demonstrably false accusations that M.F. had conducted internet searches concerning loading a firearm, disposing of a body, and committing the perfect murder;

c. caused multiple police officers to interrogate M.F., a minor, behind closed doors without a parent or attorney present;

d. made false statements causing M.F. to be placed on an involuntary psychiatric hold under Welfare and Institutions Code § 5150 and forcibly transported in a police car to a psychiatric facility, where he was confined overnight against his will and the will of his parents, despite the complete absence of any evidence that he posed a danger to himself or others;

e. compelled M.F. to write a letter expressing personal affinity and friendship toward students with whom he had no conflict; and

f. subjected M.F. to continued administrative targeting, including an attempted special-education evaluation he did not need and a targeted classroom check during a lockdown.

82. These acts of threats, intimidation, and coercion were undertaken because of, and in retaliation for, M.F.'s exercise of his protected rights and would chill a person of ordinary firmness from continuing to exercise those rights.

83. Defendant District is liable for the acts of its employees under California Government Code § 815.2 and is independently liable for its own custom, practice, and ratification of viewpoint-

based discipline and the coercive measures described herein.

84. As a direct and proximate result of Defendants' violations of Civil Code § 52.1, M.F. suffered general and special damages in an amount according to proof, including emotional distress, humiliation, loss of educational and athletic opportunities, reputational harm, and deprivation of his constitutional and statutory rights. Plaintiff is further entitled to injunctive and declaratory relief, civil penalties, and attorney's fees and costs as provided by Civil Code §§ 52 and 52.1.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs M.F. (by and through his Guardian ad Litem, R.S.), R.S., and A.F. pray for relief and judgment in their favor and against Defendants as follows:

A. General, special, nominal, and consequential damages in an amount to be proven at trial.

B. Punitive damages (only as to the individual defendants).

C. A declaration that Defendants' conduct violated M.F.'s rights under the United States Constitution; the California Constitution; California Education Code § 48907; and the Tom Bane Civil Rights Act (Cal. Civ. Code § 52.1).

D. Injunctive relief requiring the District to expunge from M.F.'s educational record all discipline and any reference to the involuntary psychiatric hold arising from the events alleged herein (available against the District under state law and against the individual defendants in their official capacities).

E. Civil penalties as provided by Civil Code §§ 52 and 52.1.

F. An award of attorney's fees and costs to the extent authorized by law or statute, including under 42 U.S.C. § 1988 and Civil Code §§ 52 and 52.1.

G. Pre- and post-judgment interest as allowed by law.

H. Such other and further relief that this Court may deem just and proper.

Date: August 19, 2026

**SWEIGART MURDOCK, LLP**

By: */s/ Karin M. Sweigart*
Karin M. Sweigart
Jesse D. Franklin-Murdock

Sweigart Murdock, LLP
1160 Battery Street, Suite 100
San Francisco, California 94111
Telephone: (415) 873-0123
Facsimile: (873) 890-0791
Email: Karin.Sweigart@sm-llp.com;
Jesse@sm-llp.com

*Counsel for Plaintiff*

**JURY DEMAND**

Plaintiffs respectfully demand a trial by jury on all claims and issues for which a jury trial is authorized by law.

Date: August 19, 2026

**SWEIGART MURDOCK, LLP**

By: /s/ *Karin M. Sweigart*

Karin M. Sweigart
Jesse D. Franklin-Murdock
Sweigart Murdock, LLP
1160 Battery Street, Suite 100
San Francisco, California 94111
Telephone: (415) 873-0123
Facsimile: (873) 890-0791
Email: Karin.Sweigart@sm-llp.com; Jesse@sm-llp.com

*Counsel for Plaintiff*